We will next hear the argument in Leniart v. William Bundy. Thank you. Okay, Mr. Khan. May it please the court, my name is Omar Khan and I, along with my colleagues Jack Zarin Rosenfeld and Charlie Bridge, represent George Leniart in this appeal. This is an extraordinary case. State officials withheld critical evidence for over six years, all the while telling the district court and Mr. Leniart that they didn't have that evidence or that they had turned it back over to his counsel. And at the end of the day, eight days after the jury verdict, they finally produced all of that evidence. I'd like to ask you to clarify something for me before you proceed. In your brief, you refer to the defendants, and you often don't distinguish among them. The caption in the case lists, I don't know, about eight different defendant appellees. You have a footnote at the beginning of your brief that identifies those whom Leniart is not appealing, but the notice of appeal doesn't distinguish them. I think that the argument that you make focuses on the parole supervisor, Ellison, but from time to time you refer to parole officer Bransford as well, who is dismissed on summary judgment. Could you just clarify exactly what you're seeking here on appeal, and who are the appellees on whom we should focus? Again, throughout the brief, you refer to just defendants generally, and it's quite unclear to me. There were two motions brought before the district court, a JAMAL motion and then 59 and 60 motions for a new trial. On the JAMAL motion on appeal, the only defendant is Manager Ellison. On the new trial motions, we submit that both defendants, Bransford and Ellison, are on appeal. The district court granted summary judgment with respect to Bransford. It's our view that the newly discovered evidence requires revisiting that summary judgment ruling, and a 60B motion, if granted, would allow us to proceed at the district court against Bransford as well. So you'd want a new trial as to Bransford and to Ellison? A new trial as to Bransford and Ellison, any ancillary discovery or motion practice relating to adverse inferences. Okay. Well, when you proceed with your argument, I would be very much appreciative if you would distinguish among the defendants, because Mr. Ellison's knowledge about the supposed contents of the tape may be different from Mr. Bransford. The misconduct alleged seemed to focus on Mr. Bransford. Sometimes a conspiracy is kind of generally adverted to, but it's important to distinguish among them, I think. Okay? For sure, and maybe we can just start there, Your Honor. Okay. So on that, the district court's, at least the new trial motion, focused in every single one of the paragraphs. It discusses how Ellison was the only defendant. He didn't have knowledge, QED, right? And that is not the correct analysis. That's error as a matter of law, because the 60B judgment of the 60B motion was as defendants in totality, including Bransford. That's for all eight defendants. The 60B motion always referred to defendants' motives and the defendants as a whole below. And so what on appeal now were focused on Bransford and Ellison, the district court didn't make that distinction and focused solely on Ellison. And what was there in the record to reflect that Mr. Ellison had knowledge of Mr. Bransford's actions with regard to the microcassette tape years after the original proceedings? Well, with respect to discovering that Mr. Bransford even had access to the tape, we didn't know that until after the trial. But what was Mr. Ellison's knowledge of, or evidence with respect to, during the trial, what could have been induced or what was known at the time? Yes, actually at the time of the search is really what I wanted to focus on. That Mr. Bransford had, or anyone, and I gather your client's testimony changed with respect to who had made the threats and who had been told about the contents of the microcassette. What was there to show that Mr. Ellison had knowledge of any of that? So the record is clear that Mr. Bransford went over to Mr. Lanier's home, that's undisputed, the morning of September 25th, 2007. Both Mr. Bransford and George Lanier testified to that. Then Mr. Bransford returned to the barracks and he had a conversation with Mr. Ellison. And it was after that conversation and further meetings and discussions with state police officers that they then proceeded back to George Lanier's home to then conduct what we believe to be- So you're talking about September 25th, 2007? All September 25th, 2007, Your Honor. So you say the record reflects that Mr. Bransford came to the home, then went back to the barracks, then came back with Mr. Ellison? Yes, Your Honor. And so you would want us to infer that they spoke about the threats that were allegedly recorded on the microcassette?  So that interaction takes on a whole new light in light of the newly discovered evidence. Because Mr. Lanier testified at trial that it was that morning, September 25th, 2007 interaction, where he told Mr. Bransford that he had the tape and played the tape for Mr. Bransford. And then Mr. Bransford returns to the barracks, he speaks to Mr. Ellison, and within hours they're all running back to Mr. Lanier's home to, among other things, grab the tape. But there had been prior testimony about parole violations in early September, right? The statements, and in August as well, about the victim, the confidential- That he's abusing children. I mean, there were reports of him abusing children even before that, right? That culminate on September 25th, correct? The reports were at least several months old at that point. The record reflects that the reports were made in July of 2006. And when did Ellison learn of them? Ellison, the testimony, and there's no dispute on this, that Ellison learned of those on that day. On that day. On September 25th, 2007, yes. And- And that's when they also learned that the GPS was malfunctioning, and so they needed to come back in any event, right? They did not have to come back in any event because, according to the testimony of Bransford and of Lanier, that the GPS was going to be fixed. I mean, there did need to be three state police officers and three parole officers to come back and fix it. No, but if they were, I mean, I understood the testimony was that in light of the allegations that Judge Sullivan has pointed to, they were, Judge, that Mr. Ellison, as supervisor, had decided that Mr. Lanier needed to be remanded to custody. He did make that decision, and it's our view that that was all pretextual in light of the earlier conversation with Mr. Bransford, which, in light of the newly discovered evidence, also, in our view, allows us to argue to the jury and have the jury infer that that conversation between Bransford and Ellison gave Ellison a pretextual reason for the search as well. Can we talk very briefly about the tape itself, which, once it's finally, the original is found, I mean, what evidence is there that the tape was erased or tampered with? So the most important point, Your Honor, is that the evidence was produced eight days after the jury verdict. Oh, I get that. Why does it matter? If there's nothing on it, why does it matter? So there's no opportunity to conduct full discovery and forensic analysis of the tape in the first instance. So we actually don't know whether it's the original tape or not, but what we do know is that it, yes? I thought somebody did look at the tape and was unable to give an expert opinion other than, and I don't mean this demeaningly, speculation that something may have been done to it, but the expert couldn't say anything had been done to it. The expert report, Your Honor, was being prepared in the habeas case, which was co-pending at the time. It was not being prepared in the civil action here, and the expert, and I was just about to get to this, the expert did say that the tape had a start-stop signature that was not on the CD copy. The CDs were not the same as the original because the CDs had three files on them, whereas the original CD that was made in 2007 had only one file, and he also had in his expert report the notion that the tape had static noises that weren't present on the CD. So just coming back. But wait a second. He says after a side-by-side comparison of the microcassette and the CD disc audio, it is clear that the content is exactly the same. And I think, Judge Carney, what's meant there is that the words are the same, but he's very clear that the start-stop signature is not on the CD and that the static on the tape. But he doesn't say the words are exactly the same. In fact, there are only two words I think that he identifies, or maybe just one, about shoes. So if I'm at 13- 1312. 1312, yep. And what he testifies, what's in his report is that if it's at 1310, it's the second paragraph under conclusion, where he talks about the two things that make the tape not identical to the CD copy. And, of course, as we pointed out in our briefs, the CD that he received from the State had three files on it. In the 2007 CD, there was only one file on it. So all of these issues, we contend, need at least further discovery and exploration at the district court. But even on this record, it would be sufficient to grant a new trial as to at least Ellison and Bransford. But you would need to show that there was, in fact, an exculpatory conversation of some kind, like the threats that he alleged in his first complaint, and that there was a conspiracy entered into, as alleged in the amended complaint, that was carried out to erase the contents of the tape within that one-day period before the CD was made. Right? Because what happened later is kind of irrelevant if the CD was an accurate reflection of the contents of the tape. And we contend that all of that would need to be discovered in the district court in the first instance. But on the existing record, the record is consistent with the notion that the tape was swapped out and that the CD copy was of a copy of the original tape. And that's what the expert is getting at, is that if, when the parole officers and the state police officers get back to the barracks, and before they send it to the lab, they make a copy of the tape of only one side that does not have the exculpatory information on it or the exculpatory statements, and they take that copy of the tape and send it to the lab first, the expert's testimony and report is perfectly consistent with that, because what he's saying is that there are start-stop signatures that lead me to believe that this might be a copy, and further exploration is needed. And before the trial court— He said it leads him to believe it might be a copy? It could be or couldn't be. You're embellishing a bit there, right? It could or couldn't be. I mean, he can't rule out conclusively that it's not a copy is what he's basically saying. Is that the standard of proof that's going to allow this to get in? Your Honor, we would contend that— Rule out the possibility? We would—so the standard we contend applies, Your Honor, would be that there's a probability that the trial would have been different or could have been different, and certainly— But you have to say it was probably different, the outcome would probably be different. Isn't it a harder standard than you're acknowledging right now? The precise formulation in the case is either as a probability or probably. We think we satisfy either standard. But the important thing is that the declaration and the affidavit of Parole Officer Bransford that was filed in the district court, his testimony at the district court, the fact that he possessed the tape, that is also additional evidence that has to— You have plenty to impeach Bransford, no question about that. But the issue is, is that enough to get you a new trial? That, we contend, Your Honor, would be enough to argue to the jury that they can reasonably infer that Bransford had a motive to seek out the tape, that he then communicated that motive to Ellison, and that they went ahead and grabbed the tape as a pretext. Why does the newly discovered evidence of the runaround from Bransford, whether it's innocent or calculated, why does that support an inference that Ellison knew about it, knew about what was on the tape at the time of the search? It comes back to the earlier questions that I was—Cockway has had. But you don't—why don't you get a new trial to reestablish things that you could have taken a shot at at trial, which is that Ellison is linked to Bransford and Hoagland and Blanchett, and it's this giant big conspiracy. This new evidence doesn't make that any more likely, does it? Your Honor, I would say two things on that. So Bransford had been dismissed on summary judgment, so this claim didn't proceed against Bransford in any event. And then second, we didn't have all this evidence to suggest that now we know, or the jury would be allowed to infer, that Bransford was particularly interested in this tape, and we would allow the jury to—we would argue to the jury that they should infer that the material misrepresentations and the evidence tampering are—support Lanyard's core thesis, that the parole officers cared about the tape and that they were at his home to seize the tape and not for a valid parole reason. And if you sort of—and the extension to Ellison, of course, really does rely on the morning of September 25th of 2007 and the meetings and discussions that happened between Bransford and Ellison on the morning of September 25th. Let me ask another quick question, if I might. Did Mr. Lanyard make any objection when he was given the CD that purported to be a copy of the tape, saying this couldn't be a copy of the tape because it doesn't have the contents on it that I expected? He did, Your Honor. Your Honor, I think it's at A137, but I'm just going to check that to make sure I got that right. Yes, so it's at A137, and he follows up with the state AG's office and says, you provided me with the CD, but it doesn't have the other side on it. It just had one side. And what I want is the custody information, and I want all the findings relating to the tape that you can give me. Okay, thank you very much. I will hear from you. Good morning, Your Honor. May it please the Court. My name is Steven Strom. I'm the Assistant Attorney General. With me to my right is Assistant Attorney General Robert Deerington. Your Honor's left. Judge Hall, can you hear me, Your Honor? I can. Thank you, Your Honor. May I proceed? Yes. Thank you. So this case, really the core issue and the sole issue is whether or not Mr. Ellison had reasonable suspicion on September 25, 2007. He was presented with three sworn statements of Mr. Leniart abusing children, plying them with alcohol, drugs, and then having sexual encounters with them, three violations of his conditions of parole, no contact with minors, no alcohol, and no illegal drugs. He was a convicted sex offender on special parole, which is a higher form of parole in Connecticut. It is a very restrictive form of parole for particularly the special management unit that Mr. Ellison supervised was a special unit with smaller caseloads for sex offenders. Then they found Mr. Leniart hiding behind a wall, having cut off the g-tube. Let me interrupt for just one second. Still, the information about his possibly abusing minors again came to light in early August, and yet this seizure and search didn't occur until towards the end of September. That strikes me as a surprising delay given the gravity of the allegations. Can you help explain why that might happen? There was nothing in the record, Your Honor, about, and there was no questioning by plaintiff's counsel on that point. Plaintiff's counsel had the dates of the statements, so they could have asked either Sergeant Bundy, who provided the statements, to Mr. Cartagena, who was also a parole officer, and Mr. Ellison. Mr. Ellison had just become the supervisor of that unit, and it came to his attention for the first time on September 25th. There was no evidence. He was aware of the statements as early as August. So the state police were. . . Sorry, Your Honor. Yes, go ahead. Mr. Ellison. . . This is a question. Mr. Ellison made the command decision that something further needed to be done? He did. He was the one who determined that Mr. Leniart was recidivating. There was testimony in the record that he was abusing minors. He felt that he had a duty at that point to protect public safety and to remand Mr. Leniart immediately. So he asked Mr. Bransford to call Mr. Leniart, have him come back to the residence for repair of the GPS, which had been reported that morning by Mr. Bransford, had been reported in need of repair. Mr. Bransford told Mr. Leniart to wait inside the residence with the GPS in the locked unit inside the house, and he asked the state police to assist with perimeter security. So the evidence at trial was that the state police were behind trees and around the perimeter of the property to prevent an escape of what they considered at that point to be a dangerous parolee. So counsel for Mr. Leniart argues that on special needs searches like parole searches, the law allows an examination of what the actual motivations of the searchers are, and that case law says that you can go beyond it to make sure that the special needs aspect of a warrantless search isn't obviated by the actual motivation of the searchers. Do you agree with that characterization of the law? No, Your Honor. As a matter of fact, like every Fourth Amendment case, the question before the court, was it objectively reasonable to conduct the search that Mr. Ellison did on September 25, 2007? Did he have objective indicia that would form reasonable suspicion that Mr. Leniart was in violation of his parole? A long line of cases from this court, United States v. Race, United States v. Newton, Vega v. Moore, all of those cases, U.S. v. Thomas, all those cases that were cited to by the district court correctly, and Mr. Ellison testified at length that he had a duty, once he was aware that there were parole violations, he had a duty to investigate for evidence of corroborating, for example, the VHS tapes where there were minors going in and out of the house. Judge Fitzsimmons was in the best position to observe the demeanor of the witnesses and the quality of the evidence, the effect of those three sworn statements on the jury, and she determined that under the circumstances, it was objectively reasonable. There was, as was asked earlier, there was no evidence that Mr. Ellison even knew about a microcassette tape until he serendipitously, by accident, finds it in the outside pocket of the laptop case. Mr. Leniart's counsel also argues that the judgment as a matter of law against Mr. Ellison should be granted because on the face of it, the microcassette tapes aren't related to the violations of supervised release that are alleged. Mr. Leniart has signed a computer access agreement and it had to do with that device and other recording devices, visual recording, but not something that would encompass the microcassette. And I wondered, I mean, you answered that this is related because some of the offense seems to have been committed in the bedroom that any recording device would be all right, but I wonder kind of how far that goes. If they had found letters in the laptop case, for example, would Mr. Ellison have been justified in securing those as well and seizing them? Yes, Your Honor, because once there is reasonable suspicion of parole violations, as long as the investigation is reasonably related to Mr. Ellison's parole duties, so the district court, for example, on the microcassette noted that the statement in the record from one of the child victims from upstate New York indicated that he had made a telephone call to Mr. Leniart. Mr. Leniart offered work or the victim called looking for work. The jury could have reasonably inferred that that letter or that recording of the phone call could have been on the microcassette. Similarly, with letters, if the letters were in the laptop case, they would not need a search warrant under Sampson in the line of cases for parole. Parolees are almost like prisoners to the extent they have extremely diminished Fourth Amendment expertise. So you need reasonable suspicion. You don't need probable cause. But it's not totally – there are some limits, aren't there? Oh, I would agree, Your Honor. I don't think Mr. Ellison could have gone upstairs in the house where Mr. Leniart's mother resided and gone through the mother's dresser drawers or things like that. But if there were items in plain view, and it was a – whether it was a letter or a picture of a romantic relationship between a child and Mr. Leniart or Mr. Leniart writing to children, he had a stipulation, no contact with minors. That would include telephone calls, letters, and so forth. Just so I'm clear, the computer access agreement is a different basis to seize that you're not proceeding under, right? That's a consent. That's a consent. That's a consent search. You're not saying that the microcassette was covered by that consent. I'm not pressing that argument. You're saying that the microcassette was something that could be seized because it was reasonable to think that it might be related to the violation. That's correct, and that's what the district court found. And she also determined that because the trial turned on credibility and reasonable inferences, there was evidence in the record. In order to prevail on his post-trial motions, Mr. Leniart has to show a total absence of any evidence in the record in favor of Mr. Ellison. Also, any facts under Reeves v. Sanderson plumbing that are debatable or arguable have to be disregarded. So what Mr. Ellison said was just like the VHS tapes, we were looking to see if people were coming or going in the residence. Mr. Cartagena testified that offenders who have sexually based offenses often do record their encounters, whether it's as a trophy of the encounter or to blackmail the victim. What are we to do, though, with what appears to have been false statements made both by Mr. Bransford, about whether there was a custody sheet, about whether he knew anything about where the microcassette was, and a false understanding by the government and by the district court about whether tapes had been returned to prior counsel, acknowledging that this was over years and there were several different proceedings ongoing. But I was struck by the absence of an inventory made by the parole officers when they conducted the search. No one seemed to know what exactly had been taken. And then these misrepresentations made later on, relevant or not relevant to the motion to granting a new trial, they're troubling. They are troubling, Your Honor, but it's answered in part by a failure of memory. Mr. Bransford brought the item to the Attorney General's office in January of 2011. But he affirmatively asserted that there was no chain of custody document and that this had never happened. He had taken the microcassette out in those 13 days or however many days it was. So on your first point, the inventory and the items that were seized were described in the parole violation report, and there is at least one parole violation report in the record. I believe it's Exhibit 525. There were subsequent addenda to the parole violation reports. For example, when the forensic unit analyzed the laptop computer that Mr. Leniart had, he had images, sexually erotic images and other indicia that he had visited websites where children, MySpace and other chat rooms and so on and so forth. So there was a parole violation addendum that listed the laptop. Mr. Bransford was not involved in the search whatsoever of the seizure of the laptop computer or the original delivery to the state police lab in 2007. His only involvement came in the course of Mr. Leniart's discovery demands in the case where he was demanding, oh, can you find the original microcassette and the recorder device and the actual microcassette? And quite frankly, I reached out to the parole office and the parole office sent Mr. Bransford, and he was in effect a messenger. He picked it up at the state police lab and brought it to our office. I immediately contacted all prior counsel. Mr. Leniart was in prison at the time. He's been in prison continuously from 2007 to the present. I contacted his Connecticut appellate public defender, his trial defense counsel, because during this period of time in 2010, he was on trial for kidnap, rape and murder and was convicted on March 2, 2010. And then he was sentenced in April of 2010. So during that period of time, Attorney Pattis was his defense attorney. I reached out to him. I reached out to Attorney Ted Koch, who was representing him on the parole violation. Mr. Koch's letter is in the file. It was believed at the time that Mr. Bransford, after no one wanted to take it, had brought it back to Mr. Koch. So when he signed the affidavit, it was his understanding and my understanding that it, in fact, had been returned to Attorney Koch. It was a mistaken understanding. And you're in the civil—you're in the Attorney General's office. That's correct. You're handling civil matters, and it's the criminal division, which is separate from the Attorney General's office, that would be handling the prosecution? That's—so in Connecticut, unlike the U.S. Attorney's office, we do not have a criminal side and a civil side. Our function is simply civil defense. In our particular unit, public safety, we do 1983 civil rights defense work of corrections, parole, state police. And I got assigned this unusual case. Usually we don't have a case with parole officers and state police. But I was assigned, and Mr. Dearington assisted me at trial. You have the transcripts that are in the joint appendix. So the habeas trial, to follow up on Your Honor's question, the habeas trial is still pending in the state superior court up in— Is that held in abeyance right now, or is that proceeding? That is proceeding, and that's where the microcassette recorder and the cassette tape is presently being held in the clerk's office. And the criminal appeal, the Connecticut Supreme Court heard an argument in the spring? That's correct, Your Honor. I did check with the assistant state's attorney, Stephen Carney, who is in the judicial district at New London to see if— he was handling that appeal. He worked on the trial, and there's no— I believe there were cross-petitions for certification to the Connecticut Supreme Court. So there were multiple issues on appeal, including whether or not there should have been an expert on jailhouse snitches and things like that. But that has not yet been decided. But that is correct, Your Honor. Our office had—and just like in this case, this search was a civil administrative search by parole officers. It had nothing to do with the police. The police didn't enter the house. The police attended. They were present. I believe Sergeant Bundy testified on September 25, 2007. He stayed near the vehicle so Mr. Leniart wouldn't bolt and escape from the vehicle. But that's the closest he was to the residence. He did not enter the residence. Thank you. Judge Hall, did you have anything further for the state of Connecticut? No, nothing further. Thank you. Thank you, Your Honors. If you have nothing further, thank you. I don't have a note about whether you reserved rebuttal time. I assume you did. Two minutes. Very good. Thank you, Your Honor. Just, I mean, to put this in context, the tape, the recorder, the chain of custody form, the envelope, all of that is not only evidence in this civil case. It's evidence in capital murder cases, as my colleague on the other side has referred to. And the discussion that we just had about Mr. Bransford just being a courier, that's nowhere in the record. And why, if he was a courier, why was the tape not the same as the original tape? Why is it not the same as the CD? Why is the recorder broken? And is this issue raised in any way in the current proceedings that are pending before the Connecticut Supreme Court? They are not currently raised at the Connecticut Supreme Court level. But certainly, one of the things that's going to be explored, if the Connecticut Supreme Court affirms the intermediate appellate court's decision to vacate the conviction at the new trial. So the absence of this potentially exculpatory evidence that your client says exists or did exist once has not been an issue in the direct appeal, is that right? Not in the appeal. I'm not quite familiar with the trial court proceedings, so I don't want to misrepresent what happened at the trial court and whether the tape was or was not relevant in the criminal trial or preceding the criminal trial. But at the appellate phase, the tape is not particularly- And in the habeas proceedings? It's a state habeas? It is at issue in the state habeas proceedings, which there's a hearing in March to determine how that's going to proceed. And I just want to focus on- Mr. Kahn, is that hearing going to address a number of the issues that are being discussed with us today? If you know. Regrettably, Your Honor, I don't know for sure. Okay. Thank you. Yeah. But if the court is interested, of course, we're happy to put that in a letter to the court after discussions with habeas counsel, which we are not. Just in my sort of time as it's winding down, I really wanted to make two points. The first is that with respect to Bransford, the fact that Ellison supervised the search, Bransford's present search and examination of George Lanyard's home would be outside his authority if he had a pretextual reason for that search activity. So his presence at George Lanyard's home to conduct that search is outside the scope of his authority, even if Ellison supervised the search. So that's really the basis for vacating a summary judgment decision. He was present, but the testimony was, and the jury seems to have believed, that Mr. Ellison found the microcassette tape after leaving the house and it was in the laptop case. So Mr. Bransford wasn't involved in the actual seizure, the physical seizure, or didn't seize it. He didn't seize that tape. But, of course, as we contend, in a new trial, the jury should be allowed to and could infer and should infer that Mr. Bransford initiated this whole process the morning of September 25, 2007, when he came over to George Lanyard's house in the first instance and then initiated what happened and transpired over the rest of the day. So whether acting in concert with Manager Ellison, whether by himself, we think that the claim against Officer Bransford should certainly proceed. And one thing, to focus on the tape, while important, we contend that we could proceed to trial in front of a jury on a new trial without even knowing what's on the tape. In other words, without, but we think it's important to conduct further discovery and forensic evidence and do motion practice on adverse inferences, because what's on the other side of the tape actually doesn't matter. What matters is whether or not they had a pretextual reason for being there. And the material misrepresentations, the tampering of the evidence, the chain of custody form, the broken seal on the envelope, the start-stop on the tape, that tells, signature on the tape, that tells a jury that these officers thought this tape was important and that they thought it was important enough to tamper with afterwards. The notion that Mr. Bransford was somehow a courier is not in the record. And if he was a courier, why does the tape have a start-stop signature? Why was the recorder broken? Finally, and I'll close with this, I'm over my time, on whether actual motivation is necessary or the intent issues. There's no warrant in this case. There's no consent. This computer access agreement doesn't give any authority to search Mr. Langer's home with respect to this particular piece of evidence. So we're really in the heartland of the special needs doctrine where actual motivation is going to be looked at because there's no other mechanism for determining whether the search in Caesar was pretextual. Thank you very much. I think we have the arguments. We'll take the matter under advisement and issue a decision in due course. Thank you.